**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

BARBARA PEARSON,                              No. CIV S-04-0151-CMK

        Plaintiff,

    vs.                              <u>MEMORANDUM OPINION AND ORDER</u>

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

_____/

        Plaintiff, who is proceeding with retained counsel, brings this action for judicial review of a final decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g). Pursuant to the consent of the parties, this case is before the undersigned for final decision on plaintiff's motion for summary judgment (Doc. 11) and defendant's cross-motion for summary judgment (Doc. 16).

/ / /

/ / /

/ / /

/ / /

1

# I. BACKGROUND

Plaintiff applied for supplemental security income benefits on June 20, 2000, based on disability.  In her applications, plaintiff claims that her impairment began on August 9, 1999.  Plaintiff claims her disability consists of a combination of back and leg pain, fibromyalgia, asthma, seizure disorder, severe headaches, nausea, vomiting, rheumatoid arthritis, vision impairments, depression, and panic attacks.  She asserts that the combination of these physical and mental impairments limits her ability to lift, carry, sit, stand, walk, perform manipulative functions with her hands, and perform basic mental activities.   Plaintiff is a United States citizen born May 17, 1957, with an eighth-grade education.

### A.    __Summary of the Evidence__[1]

Plaintiff was diagnosed with possible rheumatoid arthritis in 1985 with swelling of her hands, feet, and knees.  In 1987 plaintiff reported worsening arthritis symptoms.  By 1989 plaintiff reported increasing joint pain and was positively diagnosed with rheumatoid arthritis. By July 1990 plaintiff was experiencing pain throughout the day and was positively diagnosed with seropositive rheumatoid arthritis with increased activity.

In 1992 plaintiff suffered a work injury resulting in aching, burning, and searing pain radiating down her leg, as well as constant headaches and neck stiffness.  Plaintiff's treating chiropractor diagnosed plaintiff with severe acute lumbrosacral syndrome with bilateral sciatica and cervical syndrome.

From October 1995 through January 1996 plaintiff was evaluated by Sacramento Rheumatology Consultants in connection with a claim arising from her work injury. On examination rheumatoid arthritis was definitely ruled out.  Plaintiff was, however diagnosed with fibromyalgia.

/ / /

---

[1]    This summary is derived from plaintiff's statement of the medical evidence, to which defendant stipulates.

1       In October 1995 plaintiff underwent a psychological evaluation performed by

2   David Stewart, Ph.D.  Dr. Stewart specifically found that plaintiff did not meet the criteria for

3   malingering and that symptom exaggeration was part of unusually severe psychological

4   problems.  Dr. Stewart diagnosed plaintiff with somatization disorder and personality disorder

5   with schizotypical features.

6       In November 1995 plaintiff was examined by C. Jess Groesbeck, M.D., in

7   connection with her work injury.  Dr. Groesbeck diagnosed plaintiff with mood disorder,

8   secondary to rheumatoid arthritis and chronic pain syndrome.  He also diagnosed plaintiff with

9   cannabis abuse in remission, as well as somatoform disorder and anxiety disorder.  Dr.

10  Groesbeck examined plaintiff following his referral to Dr. Stewart for a psychological

11  evaluation.

12      In 1997 plaintiff was treated at Kaiser for fibromyalgia and muscle pain.  Plaintiff

13  reported that her medications were not helping her pain symptoms.  She was prescribed a

14  Demerol injection for pain.  Plaintiff was treated for muscle pain and headaches throughout

15  1998.  In addition, in February 1998 plaintiff reported diffuse pain, migraines, fatigue, and

16  nightmares.  In March 1998 plaintiff reported seizure episodes.  However, a neurologist who

17  examined plaintiff that month found no basis for disability.

18      In April 1998 plaintiff underwent an EEG examination which revealed right

19  cerebral abnormality and possible left cerebral abnormality.  In September 1998 plaintiff was

20  again treated for migraines and muscle pain.  In January 1999 she was treated in the emergency

21  room for migraines which had lasted four days.  Plaintiff was diagnosed with migraines and

22  fibromyalgia and given medication.  Plaintiff was seen at the emergency room again in April

23  1999 for migraines and was noted to be in obvious distress.

24      In October 1999 plaintiff was examined by agency consultative rheumatologist

25  Douglas Haselwood, M.D.  Dr. Haselwood diagnosed plaintiff with "[c]hronic complex

26  musculoskeletal pain and dysfunction syndrome with adequate historical precedence for

3

1   rheumatoid arthritis complicated by more nonspecific soft tissue pain with implications for

2   significant nonorganic amplification" and "[p]robable chronic depressive disorder."  Based on

3   his observations, testing, and a review of the claimant's medical records, Dr. Haselwood opined

4   that plaintiff could perform between sedentary and light work.  Specifically, he found that she

5   was capable of lifting and carrying up to 15 pounds occasionally and five pounds frequently; and

6   standing and walking for up to four hours in an eight-hour workday, for one hour at a time.

7         In November 1999 plaintiff was evaluated by agency consultative psychiatrist

8   Michael Joyce, M.D.  At that time, plaintiff reported four prior suicide attempts and three

9   psychiatric hospitalizations.  Dr. Joyce concluded that plaintiff should be able to follow simple

10  instructions, maintain her concentration and attention, maintain attendance, work without

11  distraction or anxiety, and identify hazards and take appropriate precautions.  However, he also

12  opined that plaintiff would have difficulty in the work setting due to her psychological

13  symptoms.

14        In December 1999 plaintiff was evaluated by an agency consultative

15  psychologist.[2]  Plaintiff was found to be moderately limited in the following areas: (1) ability to

16  carry out detailed instructions; (2) ability to maintain attention and concentration for extended

17  periods; (3) ability to perform activities within a schedule, maintain regular attendance, and be

18  punctual; (4) ability to complete a normal workday and workweek without interruptions from

19  psychological symptoms; (5) ability to interact appropriately with the general public; (6) ability

20  to accept instructions and respond appropriately to criticism; (7) ability to get along with co-

21  workers; (8) ability to maintain socially appropriate behavior; (9) ability to be aware of normal

22  hazards; and (10) ability to set realistic goals.  The agency psychologist concluded that, with

23  abstinence from drugs and alcohol, plaintiff could perform simple tasks with limited public

24  contact.

25  ─────────────────────

26        [2]       The record does not reveal the name of this agency psychologist.

1    In September 2000 plaintiff was evaluated by agency consultative psychologist

2    Janice Y. Nakagawa, Ph.D.  Dr. Nakagawa stated that plaintiff did not put forth a good effort

3    during the evaluation to present her condition in an accurate way and concluded that it was

4    impossible to make an assessment of her present functioning.  Dr. Nakagawa also noted that

5    plaintiff's  ". . . limited effort in testing and in the interview suggest that she is malingering to

6    some degree."

7    In October 2000 plaintiff was examined by agency consultative orthopedist

8    Anthony Bellomo, M.D.  On examination, Dr. Bellomo observed that plaintiff had tenderness

9    throughout her hands and mild tissue swelling of the right and left second and third

10   metacarpophalangeal joint.  Dr. Bellomo opined that plaintiff was limited to lifting or carrying

11   20 pounds frequently and 28 pounds occasionally.  He also concluded that plaintiff would have

12   difficulty with feeling, fingering, or grasping.

13   In November 2000, plaintiff's medical records were reviewed by an agency

14   consulting physician who submitted a Physical Residual Functional Capacity Assessment form.[3]

15   On that assessment, the agency physician opined that plaintiff could occasionally lift and carry

16   50 pounds and frequently lift and carry 25 pounds.  The doctor also concluded that plaintiff

17   could sit, stand, or walk for up to six hours in an eight-hour workday.  The doctor concluded that

18   plaintiff was unlimited in her ability to push and pull.  Finally, the doctor concluded that no

19   postural, visual, or manipulative limitations were established.  As an explanation for these

20   findings, the doctor states that there are no objective signs of impairment and that plaintiff is not

21   credible.  The doctor does not cite to any objective clinical or laboratory observations in support

22   of his conclusions.  The doctor did not examine plaintiff.

23   / / /

24   / / /

25

26       [3]       Again, the record does not reflect the name of this agency physician.

1    In February 2001, plaintiff's medical records were again reviewed by an agency

2    consulting physician who submitted an assessment form.[4]  This doctor reached the same

3    conclusions as outlined in the November 2000 assessment.  The agency doctor also specifically

4    noted that there are treating or examining source records which are significantly different.  This

5    doctor also did not examine plaintiff.

6    In April 2002 plaintiff's attorney referred her to psychiatrist Patricia White, M.D.,

7    for evaluation in connection with her social security case.  After examining plaintiff, Dr. White

8    diagnosed her with the following psychiatric problems: (1) chronic long-term moderately severe

9    dysthymia; (2) active cannabis dependence; (3) inactive polysubstance dependence; (4) severe

10   undifferentiated somatoform disorder; and (5) severe personality disorder with predominant

11   histrionic avoidant and dependent features.  Although she observed that plaintiff ". . . seems to

12   exaggerate and magnify both her physical and psychological symptoms," Dr. White ruled out

13   malingering.  As to plaintiff's cannabis dependence, Dr. White concluded that "even in the

14   absence of any marijuana use, her condition would remain essentially the same, even perhaps

15   somewhat worse."  Dr. White opined that plaintiff was precluded from gainful activity due to her

16   combined physical and mental impairments.  As to every category of work activity (i.e., ability

17   to follow work rules, function independently, demonstrate reliability, etc.),  Dr. White concluded

18   that plaintiff's ability was "poor" except she found plaintiff's ability to be "fair" with respect to

19   following work rules, use of judgment, ability to understand, remember, and carry out simple

20   instructions, and ability to maintain personal appearance.  In no category did Dr. White assess

21   plaintiff's ability as either "unlimited" or "good."

22   / / /

23   / / /

24   / / /

25

26       [4]       The record does not reflect the name of this doctor.

**B.**    **Procedural History**

Plaintiff's claims were initially denied.  Following denial of her request for reconsideration, plaintiff requested an administrative hearing, which was held on September 24, 2002, before Administrative Law Judge ("ALJ") James N. Baker.

In his January 2, 2003, decision, the ALJ made the following findings:

1.    The claimant has not engaged in substantial gainful activity since the alleged onset of her disability;

2.    The claimant's impairments are considered severe based on the requirements in the regulations;

3.    The claimant's medically determinable impairments of migraine headaches, osteoarthrosis, and polysubstance abuse, while severe, do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4;

4.    The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision;

5.    The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments;

6.    The claimant has the physical residual functional capacity to perform a medium exertional level of work with some non-exertional , visual, and environmental limitations; specifically, the undersigned finds that the claimant is capable of lifting and carrying u p to 50 pounds occasionally and 25 pounds frequently, standing and walking for 6 hours in an 8-hour work day, and sitting for 6 hours in an 8-hour workday; with regard to environmental limitations, the undersigned finds that while I do not believe that the claimant has  severe seizure disorder, giving her the benefit of the doubt, I find that she should be precluded from performing work which requires her to be exposed to hazards such as unprotected heights or moving machinery; also, the undersigned finds that while the records do not indicate that the claimant has a severe visual impairment, giving her the benefit of the doubt, I find that she should be precluded from work requiring very good vision (such as working with small objects or reading small print); with regard to the claimant's mental residual functional capacity, the undersigned finds that the claimant only sporadically abuses drugs and alcohol, thus this condition, while severe, does not prevent her from working; additionally, the undersigned finds that absent drug or alcohol abuse, the claimant only has a mild limitation with regard to her activities of daily living, a moderate limitation with regard to maintaining social functioning, a moderate limitation with regard to her ability to maintain concentration, persistence, or pace, and one to two episodes of decompensation;

7.      Giving the claimant the benefit of the doubt, the undersigned finds that she has no past relevant work;

8.      The claimant was, at the time of onset and is currently, a younger individual;

9.      The claimant has a limited education;

10.     The claimant has no transferable skills from any past relevant work since, giving her the benefit of the doubt, she is found not to have any past relevant work;

11.     Based on the claimant's physical residual functional capacity to perform substantially all of the activities required for a full range of medium exertional level work and considering SSR 85-15 as well as the claimant's age, education, and work experience, the undersigned finds that an application of Medical-Vocational Rule 203.25, Appendix 2, Subpart P, Regulation No. 4, is appropriate, and a conclusion of not disabled is found; therefore, the undersigned finds that there are a significant number of jobs in the national economy that the claimant could perform; and

12.     The claimant was not under a disability, as defined in the Social Security Act, at any time through the date of this decision.

Based on these findings, the ALJ concluded that plaintiff was not disabled and, therefore, not entitled to DI or SSI benefits. After the Appeals Council declined review on October 21, 2003, this appeal followed.

## II. STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole. See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999). "Substantial evidence" is more than a mere scintilla, but less than a preponderance. See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 402 (1971). The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed. See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). The court may not affirm the

8

1    Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See

2    Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the

3    administrative findings, or if there is conflicting evidence supporting a particular finding, the

4    finding of the Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th

5    Cir. 1987).  Therefore, where the evidence is susceptible to more than one rational interpretation,

6    one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas

7    v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

8    standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338

9    (9th Cir. 1988).

10

11                                  **III.  DISCUSSION**

12          In her motion for summary judgment, plaintiff argues: (1) the ALJ failed to

13   properly evaluate the various medical opinions; (2) the ALJ failed to acknowledge the impact of

14   plaintiff's somatoform disorder on her ability to work; and (3) the ALJ erred in applying the

15   Medical-Vocational Guidelines ("Grids").[5]

16          **A.     Evaluation of Medical Opinions**

17          Plaintiff argues that, despite contradictory opinions of most of the examining and

18   non-examining physicians, the ALJ erred in reaching his conclusion regarding plaintiff's residual

19   functional capacity by relying on the opinions of two non-examining state agency consultants

20   which were not based on a complete record.  Specifically, plaintiff states that ". . . [i]n picking

21   and choosing from among the opinions, the ALJ summarily credited and discredited portions of

22   individual opinions without articulating specific and legitimate reasons for selectively culling

23   through the individual opinions."

24   _____

25         [5]     Defendant responds to each of these arguments in her cross-motion.  She also
     addresses the ALJ's credibility finding.  Because plaintiff does not challenge the ALJ's
     credibility finding, that issue is not currently before the court.  This opinion focuses on the

26   claims of error asserted by plaintiff.

9

1    The weight given to medical opinions depends in part on whether they are

2    proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d

3    821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating

4    professional, who has a greater opportunity to know and observe the patient as an individual,

5    than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285

6    (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given

7    to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4

8    (9th Cir. 1990).

9    In addition to considering its source, to evaluate whether the Commissioner

10   properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are

11   in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an

12   uncontradicted opinion of a treating or examining medical professional only for "clear and

13   convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.

14   While a treating professional's opinion generally is accorded superior weight, if it is contradicted

15   by an examining professional's opinion which is supported by different independent clinical

16   findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035,

17   1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be

18   rejected only for "specific and legitimate" reasons supported by substantial evidence.  See

19   Lester, 81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough

20   summary of the facts and conflicting clinical evidence, states her interpretation of the evidence,

21   and makes a finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent

22   specific and legitimate reasons, the Commissioner must defer to the opinion of a treating or

23   examining professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining

24   professional, without other evidence, is insufficient to reject the opinion of a treating or

25   examining professional.  See id. at 831.  In any event, the Commissioner need not give weight to

26   any conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d

10

1    1111, 1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported

2    opinion); see also Magallanes, 881 F.2d at 751.

3              As a starting point, the court restates the ALJ's conclusions with respect to

4    plaintiff's physical and mental capabilities.  As to plaintiff's physical capabilities, the ALJ

5    found:

> Based on the evidence . . . the undersigned finds that the claimant retains
> the physical residual functional capacity to perform a medium exertional
> level of work with some non-exertional, visual and environmental
> limitations.  Specifically, the undersigned finds that the claimant is
> capable of lifting and carrying up to 50 pounds occasionally and 25
> pounds frequently; stand and walk for 6 hours in an 8-hour workday; and
> sit for 6 hours in an 8-hour workday.  With regard to environmental
> limitations, the undersigned finds that while I do not believe that the
> claimant has a severe seizure disorder (since there is a reference to
> "possible pseudo-seizures"), giving her the benefit of the doubt, the
> undersigned finds that the claimant should be precluded from performing
> work which requires her to be exposed to hazards such as unprotected
> heights and is precluded from work that requires her to be in close
> proximity to moving machinery.  Also, while I do not find that the
> claimant has a severe visual impairment (since her vision problems are
> only mentioned within the medical notes on one occasion, and those
> records indicate that the claimant has generally correctable vision), giving
> the claimant the benefit of the doubt, I find that she should be precluded
> from performing work that requires her to have very good vision. . . . The
> above listed physical residual functional capacity is based upon the
> findings that were made by the state agency physicians in the Physical
> Residual Functional Capacity Assessment Forms that were completed [in
> November 2000 and February 2001] upon initial consideration and
> reconsideration of her current claim as well as the claimant's complaints
> of seizure and vision-related problems and the rest of the evidence within
> the file.

As to these findings, plaintiff challenges the ALJ's analysis of the opinions of Drs. Haselwood

and Bellomo.

              As to plaintiff's mental capabilities, the ALJ concluded:

> With regard to the claimant's mental residual functional capacity, the
> undersigned finds that while the claimant's polysubstance abuse is severe,
> the records indicate that her polysubstance abuse tends to be sporadic
> rather than continuous in nature and therefore does not reach a level of
> severity that affects her ability to perform at least unskilled work.
> Therefore, with regard to the Psychiatric Review Technique Form (PRTF)
> "B" criteria, the undersigned finds that the claimant has a "mild" degree of
> limitations with regard to her activities of daily living; a "moderate"

11

degree of limitation with regard to her ability to maintain social functioning; a "moderate" degree of limitation with regard to maintaining her concentration, persistence, or pace; and "one to two" episodes of decompensation.  This mental residual functional capacity is based upon the findings that were made by [Dr. Nakagawa] that she completed on September 28, 2000, as well as the rest of the evidence within the file.

As to these findings, plaintiff challenges the ALJ's analysis of the opinions of Drs. Nakagawa, Stewart, Groesbeck, White, and Joyce.

The question for this court is whether the ALJ gave proper reasons supported by the record for rejecting particular medical opinions to reach these findings.

1.   Dr. Haselwood

Plaintiff was evaluated by Dr. Haselwood, a consultative examining rheumatologist, on October 25, 1999.  As to Dr. Haselwood, the ALJ stated:

In a Consultative Examining Rheumatology report that was completed by Douglas Haselwood, M.D., on October 25, 1999, Dr. Haselwood noted that the claimant complained of having diffuse musculoskeletal pains in her neck, back, knees, and feet starting from her early twenties, which she alleged had subsequently been diagnosed as rheumatoid arthritis and fibromyalgia.  Upon examination, Dr. Haselwood noted that the claimant showed mild to moderate tenderness and guarding diffusely over her posterior neck and upper trapezius folds bilaterally; a limitation with regard to her range of motion in her neck in all planes; mild tenderness and guarding at the lumbrosacral junction to firm percussion with flexation/extension limited by 20%; and variable tenderness and guarding to firm palpation over the small joints of her hands and wrists without frank swelling.  However, he also noted that the claimant retained reasonably good fist closure and grip strength.  Based on his observations, testing, and a review of the claimant's medical records, Dr. Haselwood assessed the claimant with having the capacity to perform between a sedentary and a light exertional level of work.  Specifically, he found that she should be capable of lifting and carrying up to 15 pounds occasionally and 5 pounds frequently; and standing and walking for up to 4 hours in an 8-hour workday, for 1 hour at a time.  The undersigned carefully considered Dr. Haselwood's findings in determining the claimant's physical residual functional capacity; however, I find that his findings are overly restrictive, given the rest of the evidence within the file, especially the findings made by the state agency physicians; therefore, I do not adopt his findings herein.  Nevertheless, it is noted that even Dr. Haselwood's report supports a finding that the claimant's physical impairments are not severe enough to prevent her from working.  Dr. Haselwood's report indicates that the claimant reported that she had been prescribed Vicodin, Ativan, Soma, and Motrin, medications that are generally prescribed for pain and an anxiety disorder.

12

1   Plaintiff argues that the ALJ improperly rejected Dr. Haselwood's opinions regarding her

2   physical capabilities.  Specifically, plaintiff asserts that the ALJ's conclusion that Dr.

3   Haselwood's findings are "overly restrictive given the rest of the evidence within the file" fails

4   to meet the ALJ's burden for rejecting the opinion of an examining medical professional.

5           The ALJ may only reject the opinion of an examining professional for specific

6   and legitimate reasons.  See Lester, 81 F.3d at 830.  To meet this burden, the ALJ must set out a

7   detailed and thorough summary of the facts and conflicting clinical evidence, state his

8   interpretation of the evidence, and make a finding.  See Magallanes, 881 F.2d at 751-55.  In this

9   case, the ALJ stated that Dr. Haselwood's assessment was overly restrictive in light of the rest of

10  the evidence.  Given that the ALJ also clearly stated that he relied on the November 2000 and

11  February 2001 agency doctor assessments, the court concludes that this is the "rest of the

12  evidence" to which the ALJ refers.  However, the ALJ did not set out a thorough summary of the

13  conflicting evidence with respect to Dr. Haselwood's opinion.  Rather, he simply referred to the

14  "rest of the evidence" and said that, in relation to this evidence, Dr. Haselwood's opinion was

15  overly restrictive.  The ALJ did not, however, detail which aspects of the "rest of the evidence"

16  conflict with Dr. Haselwood's assessment.

17          The ALJ's evaluation of Dr. Haselwood's opinion is also troubling given that the

18  "rest of the evidence" upon which the ALJ relied ostensibly consisted of the November 2000 and

19  February 2001 agency doctor assessments.  These, however, were not based on any actual

20  examination by those agency doctors.  Rather, the agency doctor assessments were based on a

21  record review.  It is well established that the opinion of a non-examining professional, without

22  other evidence, is insufficient to reject the opinion of a treating or examining professional.  See

23  Lester, 81 F.3d at 831.  Here, the ALJ rejected the opinion of Dr. Haselwood – an examining

24  professional – based on the assessments completed by non-examining professionals without

25  stating what "other evidence" supports the conclusion.

26  / / /

1    Finally, even if the ALJ properly accepted the non-examining agency doctors'

2  assessments over Dr. Haselwood's assessment, the court does not believe that the agency

3  doctors' assessments constitute substantial evidence.  Specifically, it is clear that neither doctor

4  examined plaintiff.  Moreover, neither doctor offered meaningful explanation for their findings,

5  unlike Dr. Haselwood who offered a detailed report.

6    Based on the foregoing, the court concludes that the ALJ improperly rejected the

7  opinion of Dr. Haselwood.  A remand is appropriate on this basis.

8    2.    Dr. Bellomo

9    Plaintiff was examined by Dr. Bellomo, a consultative examining orthopedist, on

10  October 9, 2000.  As to Dr. Bellomo's opinion, the ALJ stated:

11    In a Consultative Examining Orthopedic Medicine Report that was
      completed by Anthony Bellomo, M.D., on October 9, 2000, the claimant
12    was noted to complain of having pain in her neck, lower back, right and
      left shoulders, hands, hips, knees, and ankles.  The claimant also reported
13    that she experiences numbness in both her right and left legs, in her left
      arm and right hand, and weakness in both her right and left hands and
14    right and left legs.  Nevertheless, the claimant also reported that she
      continued to occasionally ride a bike.  Upon examination, Dr. Bellomo
15    noted many inconsistencies.  For example, he noted that the claimant
      appeared to be in significant distress while moving about on the
16    examination table, though she appeared to retain good upper and lower
      extremity muscle development.  He also noted that the claimant was
17    tearful throughout the examination, as though she were in pain, even
      though he never placed undue force on any portion of her body during the
18    examination and though she later showed an "unusual" loss of sensation
      over every dermatome of her upper and lower extremity upon testing.
19    Furthermore, Dr. Bellomo noted that the claimant had a better range of
      motion when she was distracted; that she consistently exerted only a
20    "poor" effort during muscle strength testing or upon repetitive motions of
      the fingers testing.  He also noted that the claimant performed
21    significantly better with regard to dexterity and grasping tests when she
      was distracted.  With regard to both of her shoulders, Dr. Bellomo noted
22    that while the claimant exhibited diffuse tenderness, he did not note any
      significant signs of atrophy, crepitus, AC joint tenderness, or instability.
23    He also noted that the claimant tested negative on the drop arm test, the
      impingement test, and on the apprehension test.  He also noted that while
24    the claimant showed tenderness in her right and left hands and wrists, and
      while she showed some very mild soft tissue swelling in the right and left
25    second and third metacarpophalangeal joint, she otherwise showed no
      signs of soft tissue swelling or crepitus in her hands and wrists, and she
26    showed no signs of deformity.  The examination of the claimant's right

14

and left hip also revealed diffuse tenderness but no crepitus.  With regard to her knees, Dr. Bellomo noted that the claimant exhibited diffuse tenderness and crepitus, but showed no signs of effusions or atrophy.  With regard to her ankles, Dr. Bellomo noted that while the claimant [showed] diffuse tenderness, there was no evidence of any soft tissue swelling or deformity.  While Dr. Bellomo noted that the claimant did not appear to exert a maximum effort during testing, he noted that the claimant could still score 4/5 for motor strength in all muscle groups; that she retained intact and symmetrical deep tendon reflexes; and that she tested negative for Babinski's signs.

Based on all of these observations and testing results, Dr. Bellomo made the assessment, in his October 9, 2000, report, that the claimant had chronic neck and lower back pain; bilateral shoulder pain; bilateral elbow pain; bilateral hand and wrist pain; chronic bilateral hip pain; chronic bilateral knee pain; and chronic foot pain.  He also found that the claimant exhibited "significant symptom magnification" throughout the exam.  Based on all of these factors, he found that the claimant could lift and carry up to 28 pounds occasionally and 20 pounds frequently; stand and walk without restriction; and sit without restriction.  He also found that she may have the manipulative limitation of only being able to frequently rather than constantly feel, finger, or grasp.  The undersigned carefully took Dr. Bellomo's findings into consideration in determining the claimant's physical residual functional capacity and adopts his findings with regard to the claimant's capacity for standing, walking, and sitting as I find that those findings are well supported by the rest of the evidence within the file.  However, the undersigned does not adopt his findings with regard to the claimant's capacity for lifting and carrying or his manipulative limitations since I do not find that the rest of the evidence supports such limited findings.  Nevertheless, it is noted that even Dr. Bellomo's report supports a finding that the claimant retains the capacity to perform work.

Plaintiff argues the ALJ erred in rejecting Dr. Bellomo's assessment as to her manipulative limitations by simply citing to the "rest of the evidence" without further analysis.

As with Dr. Haselwood, the ALJ rejected the assessment of Dr. Bellomo – an examining professional – based on the "rest of the evidence."  Because the ALJ stated that he based his physical residual functional capacity finding on the November 2000 and February 2001 non-examining state doctor assessment forms, the court concludes that this must be the "rest of the evidence" cited by the ALJ.  However, as with Dr. Haselwood, the ALJ did not discuss the particulars of this evidence or how it conflicted with Dr. Bellomo's findings.  Moreover, the ALJ rejected the opinion of an examining professional in favor of the opinions of

non-examining professionals without specifying what "other evidence" supports the conclusion.

Based on the foregoing, the court concludes that the ALJ improperly rejected the opinion of Dr. Bellomo.  A remand is appropriate on this basis.

3.    Dr. Nakagawa

Plaintiff was evaluated by Dr. Nakagawa, an agency consultative psychologist, on September 28, 2000.  As to Dr. Nakagawa, the ALJ stated:

> In a Consultative Examining Psychologist's Report that was completed by Janice Y. Nakagawa, Ph.D., on September 28, 2000, Dr. Nakagawa . . . noted that the claimant was very vague and imprecise historian whose facts seemed to conflict with the available records.  During the interview, the claimant complained of having problems with her memory; of "feeling bad all the time"; and experiencing fatigue.  In her interview, the claimant denied ever having abused alcohol and she also reported that it had been "13 to 15 years" since she had last used any drugs, in contradiction to her reports to the prior consultative examining psychiatrist [Dr. Joyce], during her examination dated November 16, 1999.  Additionally, the claimant reported having no past legal history at this examination; however, Dr. Nakagawa had evidence available to her at the time of the examination that the claimant did have an adult arrest record.  With regard to activities of daily living, the claimant admitted that she is able to cook dinner.  Upon examination, the claimant was noted to be oriented to place and person, though she was not oriented to the date; the claimant's affect was noted to be tense; and her speech was noted to be relevant and coherent.  Additionally, Dr. Nakagawa found that the claimant's ability to maintain attention and concentration were difficult to assess because the claimant was uncooperative and appeared to be irritable.  Furthermore, Dr. Nakagawa noted that the claimant did not seem to exert much effort in completing her testing; that she seemed to purposely provide inaccurate information; and that she complained throughout the process.  In fact, Dr. Nakagawa noted that the claimant did not even complete all of the tests since she claimed that she could not see some of the figures, even while wearing her glasses.  Since the claimant appears to subvert the testing process, Dr. Nakagawa found that the claimant's scores . . . could not be considered valid. . . .  Based on her observations, interview, comparison of the claimant's records, and testing, Dr. Nakagawa found that the claimant may be malingering.  Dr. Nakagawa therefore found that she could not validly find that the claimant had any severe mental impairments to her ability to work.  She also found that the claimant could probably manage her own funds if she abstained from drugs or alcohol.  The undersigned carefully considered Dr. Nakagawa's findings with regard to the claimant's problems with credibility and with her suggestion that the claimant may be malingering in determining the claimant's mental residual functional capacity and credibility.  Therefore, I find that the claimant only sporadically engages in polysubstance abuse and that when she is sober and free of drugs, she should not have any significant

1          limitations to her ability to work.

2    After an independent review of the entire record, the court finds that the ALJ misstated Dr.

3    Nakagawa's assessment.  Specifically, the ALJ stated that Dr. Nakagawa "found that she could

4    not validly find that the claimant had any severe mental impairments . . ."  This, however, is not

5    what Dr. Nakagawa concluded.  Rather, Dr. Nakagawa stated that, because plaintiff did not put

6    forth a good effort during testing, "it is difficult, if not impossible, to make an assessment of her

7    present functioning," and "it would be impossible to provide an accurate assessment of her

8    functional capacity."  Contrary to the ALJ's characterization, which suggests that Dr. Nakagawa

9    concluded that plaintiff has no mental limitations, Dr. Nakagawa concluded that no finding could

10    be made either way.

11          4.   <u>Dr. Stewart</u>

12          Dr. Stewart performed a psychological evaluation in 1995.  As to Dr. Stewart, the

13    ALJ stated:

14          . . . David L. Stewart, Ph.D., treatment records, dated October 23, 1996[6],
               are dated before the claimant's alleged onset date of August 9, 1999;
15          however, they are useful for historical reasons as they show that the
               claimant has a history of complaining of having a fear of other people,
16          following numerous traumatic incidents that she experienced as a child;
               feelings of nervousness; tenseness; unhappiness; constant worrying;
17          anhedonia; inability to function; over sensitivity to criticism; a tendency to
               blame herself; extreme fatigue; body aches; feelings of dejection, apathy
18          pessimism, loneliness, preoccupation with thoughts of death; feeling of
               unworthiness; self-doubts; and numerous family problems.  Upon
19          interviewing the claimant, Dr. Stewart noted that while the claimant
               appeared to be anxious and impulsive and that she appeared to be unable
20          to refrain from inappropriately touching and handling testing equipment'
               overall, she exhibited a labile but generally appropriate effect; and showed
21          no signs of obvious central nervous system injuries, psychosis, or
               suggestions of bizarre mental content.  He also noted that she appeared to
22          retain intact insight and judgment.  Based upon several examinations, . . .
               Dr. Stewart found that the claimant's full scale IQ was 87; therefore, he
23          found that her score was equivalent to those within the average to low
               average range of intelligence.  He also found that the claimant's Hooper
24          and WAIS-R tests were inconsistent with having any central nervous

25

26        [6]     While the ALJ states 1996 in his opinion, the record shows that Dr. Stewart
    examined plaintiff in 1995.

system injuries.  Interestingly, Dr. Stewart noted that the claimant's test results on the MCMI-III and MMPI-2 tests reveal that the claimant has a very strong tendency to disclose negative characteristics and symptoms. In fact, Dr. Stewart indicated in his report that he suspected that the claimant was exaggerating her symptoms in order to gain attention or services.  Overall, Dr. Stewart assessed the claimant with having a somatization disorder (with prominent hypochondriacal features), or in the alternative, an undifferentiated somatoform disorder and a dysthymic disorder.  The undersigned carefully took Dr. Stewart's findings into consideration in determining the claimant's mental residual functional capacity as well as in determining her credibility.

Plaintiff asserts that the ALJ improperly rejected Dr. Stewart's conclusion that plaintiff has a somatoform disorder and, instead, found that plaintiff was malingering.

With respect to malingering, the court disagrees with plaintiff's characterization of the ALJ's discussion of Dr. Stewart's opinion.  The ALJ does not state that Dr. Stewart diagnosed malingering.  Nor does the ALJ state that, based on Dr. Stewart's opinion, he believed plaintiff was a malingerer.  Rather, the ALJ simply states that he considered Dr. Stewart's opinion when formulating his assessment of plaintiff's mental residual functional capacity and credibility.

As to plaintiff's somatoform disorder, the court again must disagree with plaintiff's characterization of the ALJ's decision.  Specifically, the ALJ did not reject Dr. Stewart's conclusion that plaintiff had either a somatization disorder or an undifferentiated somatoform disorder.  Whether such disorder, either singly or in combination with plaintiff's other impairments, is sufficiently severe is a separate question which the court addresses below.

In sum, because there is nothing inconsistent between Dr. Stewart's findings and the ALJ's ultimate conclusion as to plaintiff's mental capabilities, the ALJ appears to have accepted Dr. Stewart's conclusions.

/ / /

/ / /

/ / /

/ / /

5. Dr. Groesbeck

Plaintiff was examined by Dr. Groesbeck on November 10, 1995. As to Dr. Groesbeck, the ALJ stated:

> . . . Dr. Groesbeck made his findings based upon an interview of the claimant as well as his medical review of her records. He assessed the claimant with having a mood disorder secondary to her physical problems; cannabis dependence and abuse, chronic, which was reportedly in remission; alcohol dependence, chronic, reportedly in remission; other substance abuse disorder, reportedly in remission; an undifferentiated somatoform disorder, chronic; an anxiety disorder, not otherwise specified; and a personality disorder, not otherwise specified which leads the claimant to have several traits, including a tendency to by hysterical and somatizing. Ultimately, he diagnosed the claimant with having only a "minimal" impairment with regard to following instructions; a "minimal" impairment with performing simple tasks; a "slight to moderate" impairment with regard to her work pace; a "moderate" impairment with regard to performing complex tasks; a "very slight" impairment with regard to relating to others; and a "slight" impairment for supervision. The undersigned finds that there is ample evidence within the file to support the finding that the claimant is capable of following instructions involving simple tasks and that the record as a whole shows that the claimant should be capable of relating to others and that she does not need extensive supervision; therefore, I adopt those findings made by Dr. Groesbeck. However, I find that the rest of the evidence within the file, including the findings made by the Consultative Examining Psychologist in her report dated September 28, 2000, do not support the rest of Dr. Groesbeck's findings, which are overly restrictive; therefore, I do not adopt them.

As with Drs. Haselwood and Bellomo, plaintiff argues that the ALJ erred by not meeting his burden of specifying the conflicting evidence. For the reasons discussed above, the court agrees to the extent the ALJ rejected a portion of Dr. Groesbeck's opinion.

The court is also troubled by the ALJ's reliance on the "rest of the evidence" which, given the ALJ's statement for the basis of his conclusion as to plaintiff's mental capabilities, refers to Dr. Nakagawa's report. However, as discussed above, the ALJ misstated Dr. Nakagawa's conclusion.

A remand is appropriate.

///

///

19

6.      Dr. White

Plaintiff was evaluated by Dr. White, a psychiatrist, in April 2002 at the request

of her attorney.  As to Dr. White, the ALJ stated:

> In a Psychiatric Evaluation Report . . . and in a Medical Assessment of
> Ability to do Work-Related Activities (Mental) . . . Dr. White noted that
> the claimant complained of experiencing anxiety, depression, physical
> symptoms of body, muscle, and joint pain, fatigue, low energy levels,
> frequent crying spells, isolative behavior, and constant worrying.  Upon
> observation, Dr. White assessed the claimant as being a person of low
> average intelligence, without psychotic features or organic brain damage.
> She ultimately diagnosed the claimant with chronic dysthmia that was
> long-term and moderately severe; with cannabis dependence that was
> active; polysubstance abuse (including alcohol and prescription drugs) that
> was inactive; undifferentiated somatoform disorders that are severe; and a
> personality disorder not otherwise specified with predominant histrionic
> avoidant and dependent features which are severe.  She opined that the
> claimant was not malingering, though she admitted that she also noticed
> that the claimant had a tendency to "exaggerate and magnify both her
> physical and psychological symptoms."  She found that the claimant had
> only a "poor" ability to deal with work-related stress; a "poor" ability to
> relate to co-workers, the public, or supervisors; a "poor" ability to
> maintain attention and concentration; a "poor" ability to understand either
> complex or detailed but not complex job instructions; a "poor" ability to
> behave in an emotionally stable manner; a "poor" ability to relate
> predictably in social situations; and a "poor" ability to demonstrate
> reliability.  Therefore, she ultimately found that the claimant should be
> precluded from engaging in substantial gainful activity due to her physical
> and mental impairments.  While the undersigned carefully took Dr.
> White's findings into consideration in determining the claimant's mental
> residual functional capacity, I find that her findings are overly restrictive
> and not supported by the rest of the evidence; therefore, they are not
> adopted herein.  It is noted that Dr. White admitted at the very beginning
> of her report that she conducted the psychiatric evaluation upon referral by
> the claimant's attorney.  Based on a review of the entire evidence as a
> whole, the undersigned finds that Dr. White's extremely restrictive
> assessment appears to be an accommodation to the claimant and her
> attorney and an attempt to help the claimant with respect to her social
> security claim.

Again, as with Drs. Haselwood, Bellomo, and Groesbeck, plaintiff argues, and the court agrees,

that the ALJ erred by failing to specify the conflicting evidence and provide an analysis.  In

addition, the court remains troubled by the ALJ's reliance on the "rest of the evidence" which

refers to Dr. Nakagawa's report.  Finally, to the extent the ALJ rejected Dr. White's opinion

because it was procured by plaintiff's attorney, this is not a proper basis.  See id. at 832.

1   A remand is appropriate.

2   7.   Dr. Joyce

3   Plaintiff was evaluated by Dr. Joyce, a consultative examining psychiatrist, on

4   November 16, 1999.  As to Dr. Joyce, the ALJ stated:

5   . . . Dr. Joyce found that the claimant complained of having a fear of men,
    after having experienced numerous childhood traumas; of having
6   problems with excessive sleeping; and low energy levels.  Dr. Joyce also
    noted that the claimant reported that she has been hospitalized for
7   psychiatric reasons on three occasions following suicide attempts;
    however, he noted that medical records that he had available revealed that
8   she had reported four such hospitalizations in the past.  Additionally, he
    noted that the claimant admitted that the last such attempt was 10 years
9   prior to the examination.  Dr. Joyce also noted that the claimant did not
    exhibit any psychotic symptoms, manic behaviors, or symptoms of anxiety
10  during the interview.  The report also noted that the claimant admitted to
    having a history of polysubstance abuse that dates back to when the
11  claimant was 14 or 15 years old and that she admitted to continuing to
    abuse drugs and alcohol during occasional binges.  Dr. Joyce also noted
12  that the claimant admitted that she remains capable of independently
    performing her own activities of daily living.  Upon examination, Dr.
13  Joyce noted that the claimant's mood was generally euthymic and that the
    affect was reactive; that there was no evidence of suicidality or
14  homicidality; and that the claimant was oriented to person, date, city, and
    state.  Interestingly, Dr. Joyce also indicated that he found the claimant's
15  reliability and cooperation to be somewhat questionable, given the
    inconsistencies between her reports to him versus what is noted in her
16  medical records.  He also observed that the claimant walked with an
    occasionally antalgic gait when being observed but that this gait became
17  less prominent and less consistent when she was not aware that she was
    being watched.  Based upon attention, learning, recall, calculation,
18  abstraction, fund of knowledge, judgment, geographic orientation, and
    naming examinations, Dr. Joyce assessed the claimant with having
19  probable prescription drug abuse which was active and untreated;
    polysubstance abuse; and probable chronic pain disorder associated with
20  psychological factors.  He found that the claimant should be able to follow
    simple instructions; maintain her concentration and attention; maintain
21  attendance; work without distractibility or anxiety; and identify hazards
    and take appropriate precautions.  However, he found that the claimant
22  may have some difficulty with interruptions from her psychological
    symptoms and difficulty with responding appropriately to supervisors, co-
23  workers, or the usual work situation if there are changes in her routine
    setting.  The undersigned agrees with most of Dr. Joyce's findings since I
24  find that they are supported by the rest of the evidence within the file.
    However, I find that if she were to abstain from drugs and alcohol, the
25  claimant should only have minimal problems with regard to completing a
    workday or workweek without interruption from her psychological
26  symptoms and that she would have only minimal difficulty with

consistently and appropriately responding to her supervisors, co-workers, and the usual work situations. This finding is supported by the rest of the evidence within the file.

The ALJ's error continues with his analysis of Dr. Joyce's opinion. As with Drs. Haselwood, Bellomo, Groesbeck, and White, the ALJ failed to set forth the conflicting evidence and provide an analysis. Additionally, as with Drs. Groesbeck and White, the ALJ improperly relied on his misstatement of Dr. Nakagawa's report.

A remand is appropriate.

**B.     Plaintiffs Somatoform Disorder**

Plaintiff argues that the ALJ erred by failing to consider the effect of her somatoform disorder,[7] in combination with her other impairments, on her ability to work. Specifically, plaintiff notes that Dr. Stewart diagnosed her with somatization disorder and histrionic personality disorder. Similarly, Dr. Groesbeck stated that plaintiff suffered from chronic undifferentiated somatoform disorder. Plaintiff also states that Dr. White diagnosed severe undifferentiated somatoform disorder. According to plaintiff, the ALJ was required to consider the combination of impairments, even if any one single impairment is not severe, in determining disability. See Gregory v. Bowen, 844 F.2d 664, 666 (9th Cir. 1988); SSR 96-8p. Plaintiff concludes that the ALJ's failure to address her somatoform disorder, particularly in combination with her other impairments, requires remand. In response, defendant argues that the ALJ did in fact consider plaintiff's somatoform disorder and properly concluded that, even in combination with plaintiff's other impairments, it was not sufficiently severe because it did not significantly limit her ability to do basic work.

/ / /

/ / /

---

[7]     According to the Listings of Impairments, somatoform disorder is characterized by physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms. See 20 C.F.R. Pt. 404, Subpt. P, app. 1, § 12.07. A severe enough case of this disorder may justify a finding of disability by virtue of the condition alone. See id.

1    In order to be entitled to benefits, the plaintiff must have an impairment severe

2 enough to significantly limit the physical or mental ability to do basic work activities.  See 20

3 C.F.R. §§ 404.1520(c), 416.920(c).   In determining whether a claimant's alleged impairment is

4 sufficiently severe to limit the ability to work, the Commissioner must consider the combined

5 effect of all impairments on the ability to function, without regard to whether each impairment

6 alone would be sufficiently severe.  See Smolen v. Chater, 80 F.3d 1273, 1289-90 (9th Cir.

7 1996); see also 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. §§ 404.1523 and 416.923.  An impairment,

8 or combination of impairments, can only be found to be non-severe if the evidence establishes a

9 slight abnormality that has no more than a minimal effect on an individual's ability to work.  See

10 Social Security Ruling ("SSR") 85-28; see also Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.

11 1988) (adopting SSR 85-28).  The plaintiff has the burden of establishing the severity of the

12 impairment by providing medical evidence consisting of signs, symptoms, and laboratory

13 findings.  See 20 C.F.R. §§ 404.1508, 416.908.  The plaintiff's own statement of symptoms

14 alone is insufficient.  See id.

15    Here, the first question is whether the ALJ in fact considered plaintiff's

16 somatoform disorder in combination with other impairments.  If so, the next question is whether

17 the evidence supports the conclusion that, in combination, plaintiff's somatoform disorder has no

18 more than a minimal effect on her ability to work.  As to the first question, the record is clear

19 that the ALJ recognized plaintiff's diagnosed somatoform disorder.  Specifically, in discussing

20 Dr. Stewart's opinions, the ALJ acknowledged that "Dr. Stewart assessed the claimant with

21 having a somatization . . . or undifferentiated somatoform disorder."  Similarly, the ALJ noted

22 Dr. Groesbeck's diagnosis of "undifferentiated somatoform disorder."  Because the ALJ cited 20

23 C.F.R § 416.921, which requires consideration of the combination of impairments, the court

24 concludes that the ALJ considered plaintiff's impairments – including somatoform disorder – in

25 combination.

26 / / /

1    Addressing the next question – whether plaintiff's combination of impairments,

2    which includes her somatoform disorder and other mental issues, is sufficiently severe – the

3    court notes that the ALJ concluded that plaintiff had a mild limitation with regard to her

4    activities of daily living, a moderate limitation with regard to maintaining social functioning, and

5    a moderate limitation with regard to her ability to maintain concentration, persistence, or pace.

6    The issue is whether these limitations amount to more than a minimal effect on plaintiff's ability

7    to do work. See SSR 85-28; Yuckert v. Bowen, 841 F.2d at 306.  Basic work activities include:

8    (1) walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2)

9    seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple

10   instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and

11   usual work situations; and (6) dealing with changes in a routine work setting.  See 20 C.F.R. §§

12   404.1521, 416.921.  As to plaintiff's ability to do these things, the ALJ concluded that plaintiff

13   suffered from moderate limitations with regard to maintaining social functioning and

14   concentration, persistence, or pace.  The ALJ adopted Dr. Groesbeck's conclusion that plaintiff

15   suffered a "very slight" impairment with regard to relating to others and a "slight" impairment

16   for supervision.  The ALJ also found that, if plaintiff were to abstain from drugs and alcohol, she

17   would have only minimal problems with regard to completing a workday or workweek without

18   interruption from her psychological symptoms and that she would have only minimal difficulty

19   with consistently and appropriately responding to her supervisors, co-workers, and the usual

20   work situations.

21   The court finds two problems with the ALJ's analysis.  First, the ALJ makes clear

22   that his residual mental capacity assessment was based on Dr. Nakagawa's report and his

23   residual physical capacity assessment was based on the November 2000 and February 2001 non-

24   examining doctor assessments.  As discussed above in detail, the ALJ misstated Dr. Nakagawa's

25   conclusion and the 2000 and 2001 non-examining assessments are not supported by objective

26   observations and are contradicted by examining professionals.  Therefore, these do not provide

1  substantial evidence to support the conclusion that plaintiff's somatoform disorder had only a

2  minimal effect on her ability to work.

3          Second, in concluding that plaintiff would have no more than minimal problems if

4  she abstained from drugs and alcohol, the ALJ appears to have ignored Dr. White's conclusion

5  that "even in the absence of any marijuana use, [plaintiff's] condition would remain essentially

6  the same, even perhaps somewhat worse."

7          A remand is appropriate to allow the ALJ to consider plaintiff's somatoform

8  disorder in combination with her other impairments and in light of a proper analysis of the

9  medical opinions.

10     **C.     Application of the Grids**

11          The Medical-Vocational Guidelines ("Grids") provide a uniform conclusion about

12  disability for various combinations of age, education, previous work experience, and residual

13  functional capacity.  The Grids allow the Commissioner to streamline the administrative process

14  and encourage uniform treatment of claims based on the number of jobs in the national economy

15  for any given category of residual functioning capacity.  See Heckler v. Campbell, 461 U.S. 458,

16  460-62 (1983) (discussing creation and purpose of the Grids).

17          The Commissioner may apply the Grids in lieu of taking the testimony of a

18  vocational expert only when the grids accurately and completely describe the claimant's abilities

19  and limitations.  See Jones v. Heckler, 760 F.2d 993, 998 (9th Cir. 1985); see also Heckler v.

20  Campbell, 461 U.S. 458, 462 n.5 (1983).  Thus, the Commissioner generally may not rely on the

21  Grids if a claimant suffers from non-exertional limitations because the Grids are based on

22  strength factors only.  See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(b).  "If a

23  claimant has an impairment that limits his or her ability to work without directly affecting his or

24  her strength, the claimant is said to have non-exertional . . . limitations that are not covered by

25  the Grids."  Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993) (citing 20 C.F.R., Part 404,

26  Subpart P, Appendix 2, § 200.00(d), (e)).  The Commissioner may, however, rely on the Grids

1   even when a claimant has combined exertional and non-exertional limitations, if non-exertional

2   limitations do not impact the claimant's exertional capabilities.[8]  See Bates v. Sullivan, 894 F.2d

3   1059, 1063 (9th Cir. 1990); Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988).

4          In cases where the Grids are not fully applicable, the ALJ may meet his burden

5   under step five of the sequential analysis by propounding to a vocational expert hypothetical

6   questions based on medical assumptions, supported by substantial evidence, that reflect all the

7   plaintiff's limitations.  See Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995).  Specifically,

8   the Grids are inapplicable where the plaintiff has sufficient non-exertional limitations, and the

9   ALJ is then required to obtain vocational expert testimony.  See Burkhart v. Bowen, 587 F.2d

10  1335, 1341 (9th Cir. 1988).

11         Plaintiff argues that, in light of her non-exertional limitations, application of the

12  Grids was inappropriate and, instead, the ALJ was required to obtain the testimony of a

13  vocational expert.  In this case, it is clear that plaintiff has non-exertional limitations.  The

14  question, then, is whether there is substantial evidence in the record as a whole to support the

15  conclusion that these limitations do not impact plaintiff's exertional capabilities.  As discussed

16  above, the court concludes that the ALJ's analysis of plaintiff's capabilities is flawed.

17  _____

18         [8]    Exertional capabilities are the primary strength activities of sitting, standing,
    walking, lifting, carrying, pushing, or pulling and are generally defined in terms of ability to
19  perform sedentary, light, medium, heavy, or very heavy work.  See 20 C.F.R., Part 404, Subpart
    P, Appendix 2, § 200.00(a).  "Sedentary work" involves lifting no more than 10 pounds at a time
20  and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  See 20
    C.F.R. §§ 404.1567(a) and 416.967(a).  "Light work" involves lifting no more than 20 pounds at
21  a time with frequent lifting or carrying of objects weighing up to 10 pounds.  See 20 C.F.R. §§
    404.1567(b) and 416.967(b).  "Medium work" involves lifting no more than 50 pounds at a time
22  with frequent lifting or carrying of objects weighing up to 25 pounds.  See 20 C.F.R. §§
    404.1567(c) and 416.967(c).  "Heavy work" involves lifting no more than 100 pounds at a time
23  with frequent lifting or carrying of objects weighing up to 50 pounds.  See 20 C.F.R. §§
    404.1567(d) and 416.967(d).  "Very heavy work" involves lifting objects weighing more than
24  100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.
    See 20 C.F.R. §§ 404.1567(e) and 416.967(e).
25         Non-exertional activities include mental, sensory, postural, manipulative, and
    environmental matters which do not directly affect the primary strength activities.  See 20
26  C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(e).

Therefore, any analysis of the impact of non-exertional limitations on those capabilities must also be flawed. It is possible that, after a proper analysis of the medical opinions, the ALJ will conclude that plaintiff does, in fact, have non-exertional limitations which impact her ability to work.  This would seem to be supported by the record which reflects that several doctors have opined that plaintiff's mental problems limit her ability to perform work-related tasks.

## IV.  CONCLUSION

For the foregoing reasons, this matter will be remanded under sentence four of 42 U.S.C. § 405(g) for further development of the record and further findings addressing the deficiencies noted above.

Accordingly, IT IS HEREBY ORDERED that:

1.      Plaintiff's motion for summary judgment is granted;

2.      The Commissioner's cross motion for summary judgment is denied;

3.      This matter is remanded for further proceedings consistent with this order; and

4.      The Clerk of the Court is directed to enter judgment and close this file.

DATED:   September 11, 2006.

_____
CRAIG M. KELLISON
UNITED STATES MAGISTRATE JUDGE